# Exhibit A

Approved: _Gillian Grossman_
          SAMUEL ADELSBERG / GILLIAN GROSSMAN
          Assistant United States Attorneys

Before:   THE HONORABLE PAUL E. DAVISON
          United States Magistrate Judge
          Southern District of New York

- - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                :   **SEALED COMPLAINT**

          - v. -                       :   Violations of
                                            18 U.S.C. § 371;
                                        :   8 U.S.C. § 1324(a)
MARIA LUISA ESTRELLA JAIDI, and
RAMON SINGSON ESTRELLA,                 :   COUNTY OF OFFENSE:
     a/k/a "Ramon Miguel Estrella"          WESTCHESTER
     a/k/a "Ting Estrella,"             :
                                            19m 2307
          Defendants.                   :

- - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

     ANDREW SINANOGLOU, being duly sworn, deposes and says that he
is a Special Agent with the United States Department of State,
Diplomatic Security Service, and charges as follows:

                          COUNT ONE

     (Conspiracy to Commit Visa Fraud and Make False Statements)

     1.   From at least in or about 2006, up to and including at
least in or about 2016, in the Southern District of New York and
elsewhere, MARIA LUISA ESTRELLA JAIDI and RAMON SINGSON ESTRELLA,
a/k/a "Ramon Miguel Estrella," a/k/a "Ting Estrella," the
defendants, and others known and unknown, willfully and knowingly
did combine, conspire, confederate, and agree together and with
each other, to commit offenses against the United States, to wit,
visa fraud, in violation of Title 18, United States Code, Section
1546(a); and making false statements, in violation of Title 18,
United States Code, Section 1001.

     2.   It was a part and object of the conspiracy that MARIA
LUISA ESTRELLA JAIDI and RAMON SINGSON ESTRELLA, a/k/a "Ramon
Miguel Estrella," a/k/a "Ting Estrella," the defendants, and
others known and unknown, willfully and knowingly did make under

oath, and under penalty of perjury under Title 28, United States Code, Section 1746, and did subscribe as true, false statements with respect to material facts in applications, affidavits, and other documents required by the immigration laws and regulations prescribed thereunder, and did present such applications, affidavits, and other documents which contained such false statements and which failed to contain any reasonable basis in law or fact, to wit, JAIDI and ESTRELLA caused to be submitted to the U.S. Department of State visa applications for domestic workers and employment contracts in support of visa applications for domestic workers, which JAIDI and ESTRELLA knew to contain materially false and fraudulent statements.

3.   It was a further part and object of the conspiracy that MARIA LUISA ESTRELLA JAIDI and RAMON SINGSON ESTRELLA, a/k/a "Ramon Miguel Estrella," a/k/a "Ting Estrella," the defendants, and others known and unknown, in a matter within the jurisdiction of the executive branch, willfully and knowingly, did falsify, conceal, and cover up by trick, scheme, and device material facts, and made materially false, fictitious, and fraudulent statements and representations, to wit, JAIDI and ESTRELLA caused to be submitted to the U.S. Department of State visa applications for domestic workers and employment contracts in support of visa applications for domestic workers, which JAIDI and ESTRELLA knew to contain materially false and fraudulent statements.

### OVERT ACTS

4.   In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts were committed in the Southern District of New York and elsewhere:

a.   In or about 2012, MARIA LUISA ESTRELLA JAIDI, the defendant, met with a Filipino national ("Domestic Worker-1") in the Philippines and offered him a job as her farmhand and domestic worker in the United States for a salary of $500 per month.

b.   In or about 2012, RAMON SINGSON ESTRELLA, a/k/a "Ramon Miguel Estrella," a/k/a "Ting Estrella," the defendant, instructed Domestic Worker-1 to apply for a U.S. visa. ESTRELLA further instructed Domestic Worker-1 to falsely represent on his visa application and to officials at the U.S. Embassy in Manila that Domestic Worker-1 had been hired to work as a technician at the Consulate General of the Kingdom of Morocco in New York (the "Moroccan Consulate"), when, in truth and in fact, Domestic Worker-1 had been hired to work as a farmhand and domestic worker for JAIDI.

2

c.    In or about 2013, JAIDI arranged to mail an employment contract to ESTRELLA, which ESTRELLA then provided to Domestic Worker-1 to submit as part of his visa application. The employment contract stated, among other things, that Domestic Worker-1 would receive a salary of $2,200 per month and that he would work as a technician at the Moroccan Consulate. The contract appeared to have been signed by the Consul General of the Moroccan Consulate and stamped with the words "Consulate General of the Kingdom of Morocco New York."

d.    After receiving a visa, Domestic Worker-1 worked for JAIDI on JAIDI's farm in Ancramdale, New York (the "Farm") from in or about 2013, up to and including in or about December 2018, during which time JAIDI paid Domestic Worker-1 between approximately $500 and approximately $1,000 per month. Domestic Worker-1 never worked at the Moroccan Consulate.

(Title 18, United States Code, Section 371.)

### COUNT TWO

(Conspiracy to Induce Aliens to Illegally Come to, Enter, and Reside in the United States)

5.    From at least in or about 2007, up to and including at least in or about 2016, in the Southern District of New York and elsewhere, MARIA LUISA ESTRELLA JAIDI and RAMON SINGSON ESTRELLA, a/k/a "Ramon Miguel Estrella," a/k/a "Ting Estrella," the defendants, and others known and unknown, willfully and knowingly did engage in a conspiracy to encourage and induce aliens to come to, enter, and reside in the United States, knowing and in reckless disregard of the fact that such coming to, entry, and residence was or would be in violation of law, to wit, JAIDI and ESTRELLA encouraged and induced Filipino nationals to submit to the U.S. Department of State visa applications and employment contracts in support of visa applications that JAIDI and ESTRELLA knew to contain materially false and fraudulent statements.

(Title 8, United States Code, Sections 1324(a)(1)(A)(iv) and 1324(a)(1)(A)(v)(I).)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

6.    I am a Special Agent with the U.S. Department of State (the "State Department") Diplomatic Security Service ("DSS"). I

have been personally involved in the investigation of this matter. This affidavit is based upon my personal participation in the investigation of this matter, my conversations with other law enforcement agents and witnesses, and my examination of reports and other documents. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part.

### Background on A-2, G-1, and G-5 Visas

7.     Based on my review of the publicly available website entitled "Visas for Diplomats and Foreign Government Officials,"[1] published by the Bureau of Consular Affairs within the State Department ("Website-1"), I have learned the following[2]:

a.     In order to qualify for an A-2 visa, an applicant must be "traveling to the United States on behalf of [his or her] national government to engage solely in official activities for that government. The specific duties or services that will be performed must be governmental in character or nature[.]" For example, any "[f]ull-time employee assigned by [a foreign] government, coming only to work at a foreign embassy or consulate in the United States, to perform duties which take place at an embassy," qualifies for an A-2 visa.

b.     Among other documents, an applicant for an A-2 visa must submit a nonimmigrant visa application. In addition, an A-2 visa applicant must submit a diplomatic note as "written confirmation from [the applicant's] country's government of [his or her] status and official purpose of travel."

8.     Based on my review of the publicly available website entitled "Visas for Employees of International Organizations and NATO,"[3] published by the Bureau of Consular Affairs ("Website-2"),

---

[1] Available at https://travel.state.gov/content/travel/en/us-visas/other-visa-categories/visas-diplomats.html.

[2] The quoted language in paragraph 7 has been copied from Website-1.

[3] Available at https://travel.state.gov/content/travel/en/us-visas/other-visa-categories/visa-employees-nato.html.

I have learned the following[4]:

a.   The   G   visa   category   applies   to   diplomats, government officials, and employees who will work for designated international organizations in the United States.

b.   G-1 visa holders must be "[p]ermanent mission members of a recognized government to a designated international organization [or] their immediate family members." To apply for a G-1 visa, an applicant must submit, among other documents, a nonimmigrant visa application. In addition, a G-1 visa applicant must submit a diplomatic note as "written confirmation from the international organization . . . of [the applicant's] status and [his or her] official purpose for coming to the United States."

c.   Diplomats, government officials, and employees who work for international organizations in the United States may obtain G-5 visas for their personal employees, attendants, domestic workers, and servants, if they meet certain requirements. To apply for a G-5 visa, an applicant must submit, among other items, an employment contract, signed by both the employer and the employee, that includes each of the following items, among others:

i.   "Description of Duties. The contract must describe the work to be performed, e.g., housekeeping, gardening, child care, and also must include a statement that the domestic employee shall work only for the employer who signed the contract."

ii.   "Hours of Work. The contract must state the time of the normal working hours and the number of hours per week. It is generally expected that domestic workers will be required to work 35-40 hours per week. It also must state that the domestic employee will be provided a minimum of one full day off each week. The contract must indicate the number of paid holidays, sick days, and vacation days the domestic employee will be provided."

iii.   "Minimum Wage. The contract must state the hourly wage to be paid to the domestic employee. The rate must be the greater of the minimum wage under U.S. Federal and state law, or the prevailing wage for all working hours. Information on the prevailing wage statistics by occupation and metropolitan area is available on the Department of Labor's Online Wage Library & Data Center website."

---

[4] The quoted language in paragraph 8 has been copied from Website-2.

5

iv. "The contract must state that wages will be paid to the domestic employee either weekly or biweekly. As of March 2011, the Department determined that no deductions are allowed for lodging, medical care, medical insurance, or travel. As of April 2012, deductions taken for meals are also no longer allowed."

v. "Overtime Work. The contract must state that any hours worked in excess of the normal number of hours worked per week are considered overtime hours, and that hours in which the employee is 'on call' count as work hours. It also must state that such work must be paid as required by U.S. local laws."

vi. "Payment. The contract must state that after the first 90 days of employment, all wage payments must be made by check or by electronic transfer to the domestic worker's bank account. Neither Mission members nor their family members should have access to domestic workers' bank accounts. In addition, the Department requires that the employer retain records of employment and payment for three years after the termination of the employment in order to address any complaints that may subsequently arise. Further, the bank account must be in the United States so that domestic workers may readily access and utilize their wages."

vii. "Other Required Terms of Employment. The contract must state that the employer agrees to abide by all Federal, State, and local laws in the United States. The contract also must include a statement that the domestic worker's passport and visa will be in the sole possession of the domestic worker. In addition, the contract must state that a copy of the contract and other personal property of the domestic employee will not be withheld by the employer for any reason. The contract must include a statement that the domestic worker's presence in the employer's residence will not be required except during working hours. The contract must also include a statement by the employee, promising not to accept any other employment while working for the employer."

d. After submitting a visa application, a G-5 visa applicant must attend a visa interview at a U.S. consulate or the U.S. embassy in their home country.

### Overview

9. Based on my involvement in this investigation, my conversations with other law enforcement officers and witnesses,

6

and my review of law enforcement reports and documents maintained by the State Department, I have learned the following:

      a.   As set forth in further detail below, from at least in or about 2006, up to and including at least in or about 2016, MARIA LUISA ESTRELLA JAIDI and RAMON SINGSON ESTRELLA, a/k/a "Ramon Miguel Estrella," a/k/a "Ting Estrella," the defendants, as well as a co-conspirator not named as a defendant herein ("CC-1"), participated in a scheme to fraudulently procure A-2, G-1, and G-5 visas for at least seven Filipino domestic workers (collectively, the "Domestic Workers").[5]

      b.   Based on my review of records maintained by the State Department, I am aware that CC-1 is a diplomatic agent accredited to the Permanent Mission of the Kingdom of Morocco to the United Nations (the "Moroccan Mission") with the rank of Ambassador.[6] From in or about 1980 through in or about 2016, CC-1 and JAIDI were married. From in or about 1980 up to and including the present, CC-1 and JAIDI have maintained residences in the United States and have resided in the United States, among other countries.

      c.   Based on my interviews of the Domestic Workers, I am aware that JAIDI and ESTRELLA are siblings. I am further aware that JAIDI and ESTRELLA are both Filipino nationals, and that ESTRELLA resides in the Philippines. ESTRELLA helped recruit several of the Domestic Workers in the Philippines to work for JAIDI and CC-1 in the United States and instructed the Domestic

---

[5] The Government anticipates that it will enter into non-prosecution agreements with each of the seven Domestic Workers. Under the terms of those agreements, the Government agrees not to prosecute the Domestic Workers in the event that they have criminal exposure regarding the conduct charged in this Complaint, and the Domestic Workers agree to assist the Government with its investigation and prosecution of the charges set forth herein.

[6] Based on my training, experience, and conversations with State Department employees, including State Department lawyers, I am aware that as an ambassador accredited to the Moroccan Mission, CC-1 possesses full diplomatic immunity pursuant to Article V, Section 15(1) of the United Nations Headquarters Agreement, TIAS 1676, 61 Stat. 3416; and Article 39(1) the Vienna Convention on Diplomatic Relations, 23 UST 3227, TIAS 7502.

Workers to make false statements in their visa applications and to officials at the U.S. Embassy in Manila.

d.    In order to fraudulently obtain A-2 or G-1 visas for five of the Domestic Workers, JAIDI and ESTRELLA, as well as CC-1, caused Domestic Worker-1 and four others ("Domestic Worker-2," "Domestic Worker-3," "Domestic Worker-4," and "Domestic Worker-5," respectively) to falsely state in their visa applications that they would be employed as secretaries, administrative assistants, or technicians at the Moroccan Mission or the Moroccan Consulate.

e.    In addition, JAIDI, ESTRELLA, and CC-1 caused the Domestic Workers to submit fraudulent employment contracts to the State Department in connection with their visa applications. The fraudulent employment contracts overstated the Domestic Workers' salaries, understated their hours, and falsely guaranteed benefits, including sick leave, dental insurance, and medical insurance. For two of the Domestic Workers ("Domestic Worker-6" and "Domestic Worker-7," respectively)—both of whom applied for and received G-5 visas—the employment contracts were required components of their visa applications, see supra ¶ 8(c).

f.    Once the Domestic Workers arrived in the United States, JAIDI and CC-1 employed the workers as their personal drivers, domestic helpers, farmhands, and assistants at their residence located in or around Bronxville, New York (the "Bronxville Residence") and on the Farm. JAIDI and CC-1 paid the Domestic Workers less than the minimum salary required by law and regularly compelled them to work far in excess of 40 hours per week. In addition, JAIDI and CC-1 denied the Domestic Workers benefits set forth in their employment contracts. JAIDI and CC-1 further arranged for several of the Domestic Workers to fraudulently obtain visa renewals as necessary.

g.    JAIDI, ESTRELLA, and CC-1 conspired with at least two other individuals not named as defendants herein ("CC-2" and "CC-3") to obtain visas for the Domestic Workers. CC-2 and CC-3 both work in administrative roles in an office that CC-1 maintains in Manhattan ("CC-1's Manhattan Office").[7] CC-2 and CC-3 helped cause fraudulent documents to be presented, and materially false statements to be submitted, to the State Department in support of

---

[7] Based on my involvement in this investigation, my conversations with other law enforcement officers, and my interviews with the Domestic Workers, I have learned that CC-1's Manhattan Office is separate from the Moroccan Mission, to which CC-1 is accredited.

visa applications and renewals for the Domestic Workers. The means
and methods of the conspiracies charged herein are set forth in
detail below.

## The Job Interviews

10. Based on my interviews with the Domestic Workers, my
conversations with other law enforcement officers who interviewed
the Domestic Workers, and my review of reports of those interviews,
I have learned that before the Domestic Workers applied for visas
to come to the United States, MARIA LUISA ESTRELLA JAIDI, the
defendant, or CC-1 typically conducted a job interview of the
Domestic Worker in the Philippines. Some of the Domestic Workers
also met with RAMON SINGSON ESTRELLA, a/k/a "Ramon Miguel
Estrella," a/k/a "Ting Estrella," the defendant. During those
interviews, JAIDI, ESTRELLA, and/or CC-1 informed the prospective
hire that he or she would be employed in a domestic capacity at
the Bronxville Residence or on the Farm and specified the salary
the worker would receive. In addition, JAIDI, ESTRELLA, and CC-1
directed some of the Domestic Workers to falsely state during their
visa interviews that they would be working at the Moroccan
Consulate and/or earning the fabricated salaries set forth in their
employment contracts.

11. Based on my interviews with the Domestic Workers, my
conversations with other law enforcement officers who interviewed
the Domestic Workers, and my review of reports of those interviews,
I am aware of the following examples, among others, of job
interviews of Domestic Workers conducted by MARIA LUISA ESTRELLA
JAIDI and RAMON SINGSON ESTRELLA, a/k/a "Ramon Miguel Estrella,"
a/k/a "Ting Estrella," the defendants, as well as CC-1:

a. In or about 2012, JAIDI interviewed Domestic
Worker-1 in the Philippines and hired him to work as a domestic
helper and farmhand on the Farm. During the interview, JAIDI
informed Domestic Worker-1, in substance and in part, that she
would pay him a salary of $500 a month. JAIDI further told Domestic
Worker-1, in substance and in part, that if he accurately reported
his salary to the U.S. Embassy in Manila, he would not be issued
a visa. In addition to JAIDI, Domestic Worker-1 met with ESTRELLA
in the Philippines. ESTRELLA instructed Domestic Worker-1, in
substance and in part, to represent to officials at the U.S.
Embassy in Manila that he would be working as a technician at the
Moroccan Consulate. Both JAIDI and ESTRELLA described the work
that Domestic Worker-1 would be performing for JAIDI on the Farm.
Based in part on the descriptions of his prospective job
responsibilities on the Farm, Domestic Worker-1 accepted JAIDI's

9

offer of employment and proceeded with the visa application process.

      b. In or about 2012, CC-1 interviewed Domestic Worker-3 in the Philippines. During that interview, CC-1 told Domestic Worker-3, in substance and in part, that Domestic Worker-3 would earn $500 per month as his domestic helper at the Bronxville Residence. CC-1 also stated that CC-3 would follow up with Domestic Worker-3 regarding the visa application process.

      c. In or about 2014, JAIDI interviewed Domestic Worker-4 in the Philippines. During the interview, JAIDI told Domestic Worker-4, in substance and in part, that she was hiring Domestic Worker-4 to be her personal assistant in New York; that Domestic Worker-4 would have to interview at the U.S. Embassy in Manila in order to obtain a visa; that this interview was merely a formality; and that during the visa interview Domestic Worker-4 should falsely represent that he would be working at the Moroccan Consulate once he arrived in the United States.

      d. In or about 2014, JAIDI interviewed Domestic Worker-5 in the Philippines and hired him to work as a domestic helper and farmhand on the Farm. During the interview, JAIDI informed Domestic Worker-5, in substance and in part, that she would pay him a salary of $500 per month. As with Domestic Worker-1, see supra ¶ 11(a), when JAIDI interviewed Domestic Worker-5, she described, in substance and in part, his prospective responsibilities as a worker on the Farm. Based in part on JAIDI's description of the work he would be performing on the Farm, Domestic Worker-5 accepted JAIDI's offer of employment and proceeded with the visa application process.

### The Visa Applications

    12. Based on my involvement in this investigation; my review of the Domestic Workers' visa applications, employment contracts, and other records maintained by the State Department; my conversations with other law enforcement officers; my interviews of the Domestic Workers; and my review of reports of other law enforcement officers' interviews of the Domestic Workers, I have learned that MARIA LUISA ESTRELLA JAIDI and RAMON SINGSON ESTRELLA, a/k/a "Ramon Miguel Estrella," a/k/a "Ting Estrella," the defendants, as well as CC-1, CC-2, and CC-3, provided the Domestic Workers with false information to include in their visa applications and false employment contracts to use in applying for their visas, in order to cause the State Department to issue visas

10

to the Domestic Workers. In particular, I have learned, among other things, the following:

a. In or about 2006, JAIDI hired Domestic Worker-2 to work as a helper in CC-1's Manhattan Office.[8] After Domestic Worker-2 accepted JAIDI's offer of employment, he received an employment contract from CC-1's Manhattan Office, which was submitted in support of his visa application. The employment contract was dated December 18, 2006 and signed by the Deputy Vice Consul General of the Moroccan Consulate as the "Employer." The contract falsely stated, in substance and in part, that Domestic Worker-2 "will assume the duties of a secretary at the Consulate General of Morocco" for a monthly salary of $1,700. The contract further provided, in substance and in part, that the "employer" would provide Domestic Worker-2 with medical and dental insurance and paid sick leave. Domestic Worker-2's visa application package also included a letter dated December 18, 2006 from the Vice Consul of the Moroccan Consulate to the Consulate General of the United States in the Philippines. The letter falsely stated, in part, that "the Consulate General of the Kingdom of Morocco in New York is hiring [Domestic Worker-2] as [a] secretary as of January 1, 2007." On or about January 9, 2007, the State Department issued Domestic Worker-2 an A-2 visa. In or about 2009 and 2012, Domestic Worker-2 applied for, and received, renewals of his A-2 visa. Both the 2009 and 2012 visa renewal applications falsely represented that Domestic Worker-2 was an employee of the Moroccan Consulate.

b. In or about 2010, Domestic Worker-6 accepted a job as CC-1's domestic helper at CC-1's residence in Morocco. Soon thereafter, Domestic Worker-6 applied for a visa to work for CC-1 as his domestic helper at the Bronxville Residence. Domestic Worker-6's visa application properly identified her as a personal employee of CC-1. In accordance with the application requirements for a G-5 visa, see supra ¶ 8(c), Domestic Worker-6's visa application also included an employment contract, dated January 13, 2010. CC-1's secretary in Morocco had provided the employment contract to Domestic Worker-6, and CC-1 had signed the contract as the "employer" in Domestic Worker-6's presence. The contract provided, in substance and in part, that Domestic Worker-6 would receive a salary of $1,500 a month as CC-1's "private secretary." The contract further provided, among other things, that Domestic

---

[8] Based on my interviews with Domestic Worker-2, I have learned that Domestic Worker-2 left the position as a helper in CC-1's Manhattan Office after a few months, and subsequently worked for JAIDI as her personal driver and assistant at the Bronxville Residence and on the Farm.

Worker-6 would receive medical and dental insurance, as well as paid sick leave. On or about January 20, 2010, the State Department issued Domestic Worker-6 a G-5 visa.

c.    In or about 2010, Domestic Worker-7—who had worked as a housekeeper for JAIDI and CC-1 at their New York residences since in or about 1988[9]—applied to renew her G-5 visa. ESTRELLA assisted Domestic Worker-7 with preparing her visa application and submitting it in the Philippines. Domestic Worker-7's visa application properly identified her as CC-1's domestic worker. In accordance with the application requirements for a G-5 visa, see supra ¶ 8(c), Domestic Worker-7's visa application also included an employment contract, dated June 14, 2010, and signed by CC-1 as the "employer" (the "June 2010 Contract"). The June 2010 Contract provided, among other things, that Domestic Worker-7 would receive a salary of $1,200 a month, medical and dental insurance, and paid sick leave, and that Domestic Worker-7 would remain in possession of her passport at all times. Based on my review of an internal case memo entered on or about July 16, 2010 by the State Department official who reviewed Domestic Worker-7's G-5 visa application, I have learned that Domestic Worker-7's application was rejected in part because her contract provided for a salary that was "well under [the] prevailing wage" and was otherwise "not in compliance with labor laws."

d.    Subsequently, in or about August 2010, ESTRELLA assisted Domestic Worker-7 with preparing a revised visa application and submitting it in the Philippines. The revised visa application reported a salary of $1,800 a month. Domestic Worker-7's revised visa application also included a revised employment contract, dated July 28, 2010 and again signed by CC-1 as the "employer" (the "July 2010 Contract"). The July 2010 contact provided, in substance and in part, that Domestic Worker-7 would receive an hourly wage of $10.23; would work five days a week, for eight hours a day; would receive benefits including medical and dental insurance, paid sick leave, the "[f]reedom to leave the residence on the employee's free time," and "[l]iving and working conditions that are within the prevailing standards of the USA." The contract further provided that Domestic Worker-7 would remain in possession of her passport at all times. Based on my review of an internal case memo entered on or about August 9,

---

[9] Based on my interviews with Domestic Worker-7, I have learned that Domestic Worker-7 worked as a housekeeper for MARIA LUISA ESTRELLA JAIDI, the defendant, and CC-1 from in or about 1988 through in or about 1995, and again from in or about 1998 through in or about 2014.

2010 by the State Department official who reviewed Domestic Worker-7's revised visa application, I have learned that the reviewing official noted that Domestic Worker-7 "has a new contract with [a] correct prevailing wage" and approved the issuance of a renewed G-5 visa to Domestic Worker-7. In or about 2012, Domestic Worker-7 again applied for and received a renewed G-5 visa. Domestic Worker-7's 2012 visa application likewise stated that Domestic Worker-7 earned a monthly salary of $1,800.

e.     In or about 2012, after accepting a job as CC-1's domestic helper at the Bronxville Residence, Domestic Worker-3 submitted a visa application. CC-3 helped Domestic Worker-3 prepare the visa application, which falsely stated that Domestic Worker-3 was employed as a staff member at the Moroccan Mission. CC-2 or CC-3 mailed Domestic Worker-3 an employment contract from CC-1's Manhattan Office to submit with her visa application. The employment contract, dated March 12, 2012, was signed by CC-1 and listed the Moroccan Mission as the "employer." The contract falsely stated, in substance and in part, that Domestic Worker-3 would "assume the duties of a secretary" at the Moroccan Mission for a monthly salary of $2,000. The contract further provided, in substance and in part, that Domestic Worker-3 would work five days a week for eight hours per day; would receive medical and dental insurance and paid sick leave; and would remain in possession of her passport at all times. Domestic Worker-3's visa application also included a verbal note, dated March 12, 2012, from the Moroccan Mission to the U.S. Embassy in Manila. The verbal note requested a visa for Domestic Worker-3 and falsely stated that Domestic Worker-3 had been "hired to work for this office as a secretary."

f.     Based on my review of an internal case memo entered on or about April 11, 2012 by a State Department official who reviewed Domestic Worker-3's visa application, I have learned that Domestic Worker-3 was initially refused a visa in part due to an "insufficient contract." Based on my interviews of Domestic Worker-3, my conversations with other law enforcement officers who interviewed Domestic Worker-3, and my review of reports of those interviews, I have learned that following Domestic Worker-3's unsuccessful visa application, CC-3 informed Domestic Worker-3 that CC-3 would provide Domestic Worker-3 with a revised contract that included a higher salary. Domestic Worker-3 subsequently received a revised employment contract, dated March 27, 2012, that provided for a monthly salary of $3,200 and was otherwise substantially the same as the original contract. The revised contract bore CC-1's signature and again listed the Moroccan Mission as the "employer." Domestic Worker-3 submitted the revised

13

contract to the State Department. CC-3 instructed Domestic Worker-3, in substance and in part, that if questioned by U.S. Embassy officials in Manila, Domestic Worker-3 should falsely represent that she would be working as a secretary at the Moroccan Mission and not in CC-1's residence. On or about April 18, 2012, the State Department issued Domestic Worker-3 a G-1 visa.

        g.  In or about 2013, after accepting a job as JAIDI's domestic helper and farmhand on the Farm, Domestic Worker-1 submitted a visa application. At ESTRELLA's direction, Domestic Worker-1 falsely represented on his visa application that he was an employee of the Moroccan Consulate. In addition, ESTRELLA provided Domestic Worker-1 with an employment contract to submit with his visa application. The contract, dated January 3, 2013, was signed by the Consul General of the Moroccan Consulate as the "employer." The contract falsely stated, in substance and in part, that Domestic Worker-1 would "assume the duties of a technician" at the Moroccan Consulate for a monthly salary of $2,200. The contract further provided, in substance and in part, that Domestic Worker-1 would "be on duty" for five days a week, eight hours per day; that Domestic Worker-1 would receive medical and dental insurance, paid sick leave, and "[l]iving and working conditions which are within the prevailing standards of the USA"; that Domestic Worker-1 would have the "[f]reedom to leave the [employer's] residence on the employee's free time"; and that Domestic Worker-1 would remain in possession of his passport at all times. Domestic Worker-1's visa application also included a verbal note from the Moroccan Consulate to the U.S. Embassy in Manila, dated January 3, 2013, that requested an A-2 visa for Domestic Worker-1 and falsely described him as "an employee recently hired to work for this Consulate General." On or about March 13, 2013, the State Department issued an A-2 visa to Domestic Worker-1.

        h.  In or about 2014, after accepting a job as JAIDI's personal assistant at the Bronxville Residence and on the Farm, Domestic Worker-4 submitted a visa application. Domestic Worker-4's visa application included a verbal note, dated March 10, 2014, from the Moroccan Consulate to the U.S. Embassy in Manila that requested a visa for Domestic Worker-4 and falsely described him as an employee "hired to work for this office as an administrative assistant." In addition, Domestic Worker-4's visa application included an employment contract, which CC-2 had mailed to him from CC-1's Manhattan Office. The contract, dated March 10, 2014, was signed by the Consul General of the Moroccan Consulate as the "employer." The contract falsely stated, in substance and in part, that Domestic Worker-4 would "assume the duties of an

14

administrative assistant" at the Moroccan Consulate for a monthly salary of $1,800. The contract further provided, in substance and in part, that Domestic Worker-4 would "be on duty" for five days a week, eight hours per day; that Domestic Worker-4 would receive medical and dental insurance and paid sick leave; and that Domestic Worker-4 would remain in possession of his passport at all times. On or about March 24, 2014, the State Department issued an A-2 visa to Domestic Worker-4.

i.   In or about 2014, after accepting a job offer as JAIDI's domestic helper and farmhand on the Farm, Domestic Worker-5 applied for an A-2 visa. Domestic Worker-5's visa application falsely represented that he was employed as a staff member at the Moroccan Consulate. In addition, Domestic Worker-5's visa application included a verbal note, dated April 1, 2014, from the Moroccan Consulate to the U.S. Embassy in Manila that requested an A-2 visa for Domestic Worker-5 and falsely described him as an employee "hired to work at this office as a technician." As with the other Domestic Workers, Domestic Worker-5's visa application included an employment contract, which was dated April 1, 2014, and signed by the Consul General of the Moroccan Consulate as the "employer." The contract falsely provided, in substance and in part, that Domestic Worker-5 would "assume the duties of a technician" at the Moroccan Consulate for a monthly salary of $1,800. The contract further provided, in substance and in part, that Domestic Worker-5 would "be on duty" five days a week, eight hours per day; that Domestic Worker-5 would receive medical and dental insurance and paid sick leave; and that Domestic Worker-5 would remain in possession of his passport at all times.

j.   Based on my interviews of Domestic Worker-5, I have learned that ESTRELLA instructed Domestic Worker-5 that he must memorize the contents of his false employment contract and cite to the provisions therein in response to any questions from U.S. Embassy officials in Manila. On or about May 2, 2014, the State Department issued an A-2 visa to Domestic Worker-5. In or about 2016, Domestic Worker-5 applied for and received a renewed A-2 visa. His 2016 visa renewal application included a verbal note from the Moroccan Embassy that requested a renewed visa for Domestic Worker-5 and described him as a "Technician employed by the Consulate General of Morocco in New York."

13.   I have reviewed an electronic database maintained by the State Department that contains, among other records, visa applications submitted by or on behalf of the Domestic Workers since at least in or about 2010 (the "Database"). Based on my review of the Database, as well as my conversations with an

15

employee of the State Department's Bureau of Consular Affairs, I have learned that since at least in or about 2010, each of the Domestic Workers' visa applications have contained a certification that the answers provided in response to application questions "are true and correct to the best of [the applicant's] knowledge and belief." In addition, with one exception,[10] the certification further states that all "declarations made in this application are unsworn declarations made under penalty of perjury."

14. Based on my interviews with Domestic Worker-7, I have learned that in or about 2002, MARIA LUISA ESTRELLA JAIDI, the defendant, and CC-1 had a conversation with Domestic Worker-7 at their Bronxville Residence, during which JAIDI and CC-1 told Domestic Worker-7 the following, in substance and in part:

a. JAIDI and CC-1 stated that if Domestic Worker-7 should have any future visa interviews in connection with renewals of her G-5 visa, Domestic Worker-7 should lie about her salary; specifically, Domestic Worker-7 should represent to U.S. officials that JAIDI and CC-1 paid her the salary set forth in her employment contract, rather than Domestic Worker-7's actual, far lower salary, see infra ¶ 17(g).

b. JAIDI and CC-1 further explained that CC-1 is able to sponsor visas for only two domestic workers under his own name, so other Moroccan officials in the United States had sponsored the visas for some of the other members of JAIDI and CC-1's domestic staff.

c. JAIDI and CC-1 instructed Domestic Worker-7 to refrain from mentioning other members of JAIDI and CC-1's domestic staff during any future visa interviews.

15. Based on my interviews with Domestic Worker-4, I have learned that MARIA LUISA ESTRELLA JAIDI, the defendant, maintains an email account (the "Jaidi Email Account"), which she used to correspond with Domestic Worker-4 while Domestic Worker-4 was working for her. Pursuant to a search warrant issued by the Honorable Lisa Margaret Smith, U.S. Magistrate Judge in the Southern District of New York, on or about October 3, 2018, I have reviewed email correspondence in the Jaidi Email Account and have learned that JAIDI has exchanged emails with RAMON SINGSON ESTRELLA, a/k/a "Ramon Miguel Estrella," a/k/a "Ting Estrella,"

---

[10] The certification in Domestic Worker-6's 2010 visa application does not contain the language regarding unsworn declarations made under penalty of perjury.

the defendant, whom she addressed by the nickname "Ting" in emails and who appeared saved under the contact name "Ting Estrella" in the Jaidi Email Account. In addition, JAIDI has corresponded with ESTRELLA's wife ("Estrella's Wife"), who JAIDI likewise addressed by name in emails. Based on my review of JAIDI's email correspondence, I have learned, among other things, that JAIDI and ESTRELLA took a number of steps to recruit Domestic Worker-1 to work for JAIDI on the Farm and to fraudulently obtain an A-2 visa for Domestic Worker-1. JAIDI's email correspondence includes the following, in substance and in part:

a.   On or about August 15, 2012, ESTRELLA sent JAIDI an email stating, in part: "The guy I was going to recommend to you has gotten a passport already. He was so excited about the job opportunity. Let me require him to take a medical exam before we seriously consider him. I want to give you a healthy farmhand."

b.   On or about September 10, 2012, ESTRELLA sent JAIDI an email stating, in part: "I have a perfect prospect for the farm!" ESTRELLA's email continued, in substance and in part, to identify Domestic Worker-1 by a shortened version of Domestic Worker-1's first name and to explain that Domestic Worker-1 had worked for ESTRELLA and Estrella's Wife as a "temporary houseboy" after they were married. ESTRELLA further wrote, in reference to Domestic Worker-1, "You will like him because he is respectful and obedient." Later on or about September 10, 2012, JAIDI responded to ESTRELLA, requesting Domestic Worker-1's "bio data and photo."

c.   On or about September 17, 2012, ESTRELLA sent JAIDI an email containing Domestic Worker-1's resume.

d.   On or about September 21, 2012, JAIDI sent ESTRELLA an email stating, "Does he know IT and anything else? We need to enhance his application. What did he used to do for you?" Later on or about September 21, 2012, ESTRELLA responded to JAIDI stating, in substance and in part, that he would ask Domestic Worker-1 and Domestic Worker-1's current employer for "a more comprehensive description of [Domestic Worker-1's current] duties and capabilities. I did not know that it was for the visa application. I will work on it with them."

e.   On or about October 28, 2012, Estrella's Wife sent JAIDI an email stating, in substance and in part, that Domestic Worker-1 had received his birth certificate. Estrella's Wife asked JAIDI to instruct her and ESTRELLA on "the next step." Later on or about October 28, 2012, JAIDI responded to Estrella's Wife,

stating that Domestic Worker-1 "has to get a passport [a]s soon as possible."

f. On or about November 15, 2012, JAIDI emailed ESTRELLA stating, in part, "Please send me [a] copy of [Domestic Worker-1's] passport."

g. On or about November 22, 2012, ESTRELLA emailed JAIDI a copy of Domestic Worker-1's passport.

h. On or about January 5, 2013, JAIDI emailed ESTRELLA and asked, "Where shall we send the contract of [Domestic Worker-1]?" On or about January 7, 2013, ESTRELLA responded to JAIDI and wrote, "Kindly send it to the house . . . and I can have him pick it up here."

i. On or about February 27, 2013, Estrella's Wife emailed JAIDI and wrote, in part, that Domestic Worker-1 "is going back to [the] embassy tomorrow.  He was just wondering what he should answer if they ask him how did he find out about the job offer?"

j. On or about February 28, 2013, JAIDI responded to Estrella's Wife and wrote, in substance and in part, that Domestic Worker-1 should say that a friend of his who used to work at the Moroccan Consulate had recommended him for the job. JAIDI further stated that Domestic Worker-1 "is listed in the contract as a technician.  He can say he has experience repairing office machines (printers, copiers, etc) and electrical problems as well as appliances."

k. On or about March 5, 2013, JAIDI emailed Estrella's Wife stating, in part, "I've been texting Ting about [Domestic Worker-1] but he hasn't responded.  How did his interview go?"

l. On or about June 28, 2013, JAIDI emailed a particular email account ("CC-2's Email"). Based on my interviews of the Domestic Workers, I have learned that CC-2's Email belonged to CC-2, because CC-2 used it to correspond with the Domestic Workers regarding employment-related matters. In JAIDI's email to CC-2, JAIDI wrote that Domestic Worker-1 had "received his visa." JAIDI further asked CC-2 to email a plane ticket for Domestic Worker-1 as soon as possible.

### Compensation

16. Based on my participation in this investigation, my interviews of the Domestic Workers, my conversations with other law enforcement agents who have interviewed the Domestic Workers, and my review of reports of those interviews, I have learned that notwithstanding the fabricated positions at the Moroccan Consulate and the Moroccan Mission listed in the A-2 and G-1 visa applications of Domestic Worker-1, Domestic Worker-2, Domestic Worker-3, Domestic Worker-4, and Domestic Worker-5, see supra ¶ 12(a),(e)-(i), MARIA LUISA ESTRELLA JAIDI, the defendant, and CC-1 employed all of the Domestic Workers as their personal domestic helpers, farmhands, drivers, and/or personal assistants at the Bronxville Residence and on the Farm. In addition, as set forth in more detail below, JAIDI and CC-1 paid the Domestic Workers far below both the minimum wage required by law and the salaries set forth in their employment contracts.[11]

17. Based on my interviews of the Domestic Workers, my conversations with other law enforcement agents who interviewed the Domestic Workers, and my review of reports of those interviews, as well as my review of bank records, I have learned the following, among other things, regarding the salaries that MARIA LUISA ESTRELLA JAIDI, the defendant, and CC-1 paid the Domestic Workers:

a. From in or about 2012, when Domestic Worker-3 began working for JAIDI and CC-1, up to and including in or about 2014, JAIDI and CC-1 paid Domestic Worker-3 a monthly salary of approximately $500 in cash. From in or about 2014 until Domestic Worker-3 left JAIDI and CC-1's employment in or about October 2015, JAIDI and CC-1 paid Domestic Worker-3 a monthly salary of approximately $1,100 in cash. As set forth above, Domestic Worker-3's employment contract submitted in support of her visa application set forth a monthly salary of $3,200, see supra ¶ 12(f).

b. In or about 2013, when Domestic Worker-1 began working for JAIDI on the Farm, JAIDI paid Domestic Worker-1 a

---

[11] Based on my review of open source materials available on the New York State Department of Labor website, I have learned that in or about 2007, the minimum wage in New York State was $7.15. Since in or about 2007, the minimum wage in New York State has increased to $11.10. Based on my review of open source materials available on the U.S. Department of Labor website, I have learned that in or about 2007, the federal minimum wage was $5.85. Since in or about 2007, the federal minimum wage has increased to $7.25.

monthly salary of approximately $500 in cash. JAIDI incrementally increased Domestic Worker-1's salary on an annual basis until in or about November 2017, at which point JAIDI was paying Domestic Worker-1 a monthly salary of approximately $1,000 in cash. JAIDI continued to pay Domestic Worker-1 a monthly salary of $1,000 in cash until Domestic Worker-1 left JAIDI's employment in or about December 2018. As set forth above, Domestic Worker-1's employment contract submitted in support of his visa application provided for a monthly salary of $2,200, see supra ¶ 12(g).

       c.    In or about 2014, when Domestic Worker-5 began working for JAIDI on the Farm, JAIDI paid Domestic Worker-5 a monthly salary of approximately $500 in cash. As with Domestic Worker-1, JAIDI incrementally increased Domestic Worker-5's salary on an annual basis such that by in or about 2018, when Domestic Worker-5 left JAIDI's employment, JAIDI was paying Domestic Worker-5 a monthly salary of approximately $800 to $900 in cash. As set forth above, Domestic Worker-5's employment contract submitted in support of his visa application provided for a monthly salary of $1,800, see supra ¶ 12(i).

       d.    JAIDI and CC-1 typically paid Domestic Worker-2, Domestic Worker-4, Domestic Worker-6, and Domestic Worker-7[12] their monthly salaries by check. Based on my interviews with each of those workers, my conversations with other law enforcement officers who interviewed those workers, and my review of reports of those interviews, I have learned that JAIDI or CC-1 would regularly issue monthly paychecks to each of those workers for the approximate amounts set forth in their employment contracts. JAIDI and CC-1 then required each of those workers to deposit their paychecks in their respective bank accounts, wait for the checks to clear, and then withdraw a portion of the paycheck in cash and return it to JAIDI or to CC-1's Manhattan Office.

       e.    From in or about 2007, when Domestic Worker-2 began working as JAIDI's driver and personal assistant, up to and including in or about 2010, JAIDI and CC-1 gave Domestic Worker-2 a monthly paycheck for $1,200 and permitted him to keep the entire amount. From in or about 2010 until Domestic Worker-2 left JAIDI's employment in or about 2014, JAIDI typically gave Domestic Worker-2 a monthly paycheck of $1,800. Each month, JAIDI required

---

[12] Based on my interviews with Domestic Worker-7, I have learned that MARIA LUISA ESTRELLA JAIDI, the defendant, and CC-1 initially paid Domestic Worker-7 in cash, but subsequently switched to check in the later years of her employment.

Domestic Worker-2 to return between approximately $400 and $600 from his $1,800 paycheck. As set forth above, Domestic Worker-2's employment contract provided for a monthly salary of $1,700, see supra ¶ 12(a).

      f.  Based on my interviews of Domestic Worker-2, I am aware that JAIDI regularly directed Domestic Worker-2 to drive other members of JAIDI and CC-1's domestic staff to their respective banks so they could deposit their monthly paychecks and, after the checks had cleared, withdraw cash to return to JAIDI. At times, JAIDI also directed Domestic Worker-2 to write monthly paychecks for other members of JAIDI and CC-1's domestic staff in the amount of $1,800, a portion of which the other domestic employees likewise were required to return to JAIDI.[13]

      g.  In or about 1988, when Domestic Worker-7 first began working for JAIDI and CC-1, they paid Domestic Worker-7 a monthly salary of approximately $300 in cash. JAIDI and CC-1 tended to increase Domestic Worker-7's salary by incremental amounts, such that by the time Domestic Worker-7 left JAIDI and CC-1's employment in or about 2014, JAIDI and CC-1 were paying Domestic Worker-7 a monthly salary of approximately $850. During at least the last several years of Domestic Worker-7's employment with JAIDI and CC-1, Domestic Worker-7 typically received a paycheck in the amount of $1,200 or $1,800. JAIDI and CC-1 required that Domestic Worker-7 return the difference between the amount of the paycheck and her $850 monthly salary in cash to JAIDI or to CC-1's Manhattan Office. As set forth above, Domestic Worker-7's 2010 and 2012 G-5 visa applications provided for a monthly salary of $1,800, see supra ¶ 12(d).

      h.  Domestic Worker-6 worked for JAIDI and CC-1 from in or about early 2010 until in or about August 2011. Throughout that period, JAIDI and CC-1 paid Domestic Worker-6 a salary of approximately $600 per month. At times, JAIDI and CC-1 paid Domestic Worker-6's monthly salary with a paycheck for $1,800, of which Domestic Worker-6 was required to return approximately $1,200 to JAIDI. As set forth above, Domestic Worker-6's employment contract submitted in support of her G-5 visa

---

[13] From my review of the Jaidi Email Account, I have learned that in or about 2011 and in or about 2013, MARIA LUISA ESTRELLA JAIDI, the defendant, sent emails to Domestic Worker-2 with instructions to pay the salaries of JAIDI and CC-1's other domestic staff by check or cash.

application set forth a monthly salary of $1,500, see supra ¶ 12(b).

i. From in or about April 2014, when Domestic Worker-4 began working as JAIDI's driver and personal assistant, through in or about June 2014, Domestic Worker-4 received a monthly paycheck for $1,200. JAIDI permitted Domestic Worker-4 to keep the entire $1,200 as his monthly salary. Beginning in or about July 2014, however, Domestic Worker-4 received monthly paychecks for $1,800, of which Domestic Worker-4 was required to return $600 to CC-1's Manhattan Office. On one occasion in or about late 2014, Domestic Worker-4 forgot to return to CC-1's Manhattan Office $600 from an $1,800 paycheck. From that point until Domestic Worker-4 left JAIDI's employment in or about September 2015, Domestic Worker-4 again received monthly paychecks for $1,200. As set forth above, Domestic Worker-4's employment contract submitted in support of his visa application set forth a monthly salary of $1,800, see supra ¶ 12(h).

18. I have reviewed bank records for bank accounts belonging to Domestic Worker-2, Domestic Worker-4, Domestic Worker-6, and Domestic Worker-7 during their periods of employment with JAIDI and/or CC-1. Based on my review of those bank records, my conversations with a DSS financial analyst ("Analyst-1"), and my review of Analyst-1's reports regarding those records, I have learned the following:

a. Domestic Worker-2's bank records show that he received 35 monthly paychecks for $1,200 during the period from in or about October 2007 through in or about August 2010; and 41 monthly paychecks for $1,800 during the period from in or about September 2010 through in or about January 2014. The checks were drawn on accounts in the name of "Maria Luisa Estrella Jaidi" or "Maria-Luisa Jaidi," or in the name of CC-1. Domestic Worker-2's bank records further show that Domestic Worker-2 made 30 cash withdrawals in amounts totaling or exceeding $600—the amount of his monthly paycheck that JAIDI required he return in cash—between in or about September 2010 and in or about January 2014. Domestic Worker-2 typically made those withdrawals within several days of depositing the paychecks.

b. Domestic Worker-7's bank account records show that Domestic Worker-7 typically received paychecks for $1,200 from at least in or about February 2008 through in or about July 2010. Domestic Worker-7's bank records further show that she typically received paychecks for $1,800 from in or about August 2010 through in or about September 2014. Almost all of the paychecks were drawn

on accounts held in the name of "Maria Luisa Jaidi," jointly held in the name of "Maria Luisa Jaidi" and the name of Domestic Worker-2, or held in the name of CC-1. Typically, within days of depositing a paycheck, Domestic Worker-7 withdrew cash in amounts ranging from approximately a few hundred dollars up to approximately $2,400.

      c. Domestic Worker-6's bank account records show that Domestic Worker-6 received monthly paychecks in the amount of $1,800 from in or about October 2010 through in or about June 2011. The checks were drawn on an account held jointly in the name of "Maria Luisa Jaidi" and in the name of Domestic Worker-2. Upon depositing those checks, Domestic Worker-6 would typically withdraw cash in various amounts ranging from approximately a few hundred dollars to $1,800.

      d. Domestic Worker-4's bank account records show that Domestic Worker-4 received monthly paychecks for $1,200 from in or about April 2014 through in or about June 2014, and monthly paychecks for $1,800 from in or about July 2014 through in or about October 2014. The records further show that from in or about November 2014 through in or about August 2015, Domestic Worker-4 again received monthly checks for $1,200. All of the paychecks were drawn on a checking account in the name of CC-1. Upon depositing the paychecks, Domestic Worker-4 typically withdrew cash in amounts ranging from approximately a few hundred dollars to $1,700.

      19. Based on my conversations with an employee of the State Department's U.S. Mission to the United Nations, Office of Host Country Affairs, I have learned that in or about 2016, CC-1 filed a document entitled "Agreement" (the "Divorce Agreement") with the Office of Host Country Affairs. Based on my review of the Divorce Agreement, I have learned that the Divorce Agreement is dated June 16, 2016 and bears the signatures of MARIA LUISA ESTRELLA JAIDI, the defendant, and CC-1, as well as the Consul General for the Moroccan Consulate. The Divorce Agreement states, in substance and in part, that JAIDI and CC-1 "have decided to terminate their marriage by mutual consent in accordance with the provisions of Article 114 of the Moroccan Family Code." The agreement further sets forth various terms to which JAIDI and CC-1 agreed in terminating their marriage, including the following, in substance and in part:

      a. The Divorce Agreement states that CC-1 will "donate" the Farm to JAIDI.

23

b.   The Divorce Agreement states that CC-1 will "help as much as possible in case of visa problems regarding the employees of the Farm."

c.   The Divorce Agreement states that CC-1 will "pay the salaries of the employees of upstate[.]" The agreement then sets forth Domestic Worker-5's first and middle name, followed by "(500 USD)" and Domestic Worker-1's first name, followed by "(650 USD)." Based on the fact that the agreement refers to Domestic Worker-5 and Domestic Worker-1 by name—both of whom worked on the Farm located in or around upstate New York—I believe this provision of the Divorce Agreement references CC-1's agreement to pay Domestic Worker-5 and Domestic Worker-1 monthly salaries, which, as of the date of the Divorce Agreement, appear to have been $500 and $650, respectively.

d.   The Divorce Agreement states that CC-1 will allow JAIDI "access to service from maids" from the Bronxville Residence.

## Working Conditions

20.   Based on my interviews of the Domestic Workers, my conversations with other law enforcement agents who interviewed the Domestic Workers, and my review of reports of those interviews, I have learned that, in addition to paying the Domestic Workers less than the salaries set forth in their employment contracts, MARIA LUISA ESTRELLA JAIDI, the defendant, and CC-1 subjected the Domestic Workers to working conditions that differed in significant respects from the terms set forth in their employment contracts, *see supra* ¶ 12. In particular, I have learned the following, in substance and in part:

a.   JAIDI and CC-1 regularly compelled each of the Domestic Workers to work seven days a week, without a regular day off. All of the Domestic Workers typically worked far in excess of 40 hours per week. In particular, Domestic Worker-1 and Domestic Worker-5 typically worked approximately eight hours per day, seven days a week. Domestic Worker-2, Domestic Worker-3, Domestic Worker-4, Domestic Worker-6, and Domestic Worker-7 typically worked between approximately 10 and 14 hours per day, seven days a week. When JAIDI and CC-1 hosted parties, the Domestic Workers worked as many as approximately 18 hours per day. As set forth above, the employment contracts submitted in support of visa applications for Domestic Worker-1, Domestic Worker-3, Domestic Worker-4, Domestic Worker-5, and Domestic Worker-7 provided that the Domestic Workers would be "on duty" five days a week for eight hours a day, *see supra* ¶ 12(d)-(e), (g)-(i). In

24

addition, the employment contracts for Domestic Worker-1 and Domestic Worker-7 provided that those workers would have the freedom to leave their employer's residence on their free time, see supra ¶ 12 (d), (g).

   b. When JAIDI and CC-1 permitted a Domestic Worker an occasional day off, they required the Domestic Worker to return to the Bronxville Residence or the Farm by the early evening, such that none of the Domestic Workers were permitted overnight absences in the United States.[14]

   c. With the exception of Domestic Worker-3 and Domestic Worker-7, JAIDI and CC-1 did not provide any of the Domestic Workers with medical or dental insurance. As set forth above, the employment contracts submitted in support of each of the other Domestic Workers' visa applications provided that the Domestic Workers would receive both medical and dental insurance, see supra ¶ 12(a)-(b), (g)-(i).

   d. With the exception of Domestic Worker-2, JAIDI and CC-1 did not permit the Domestic Workers to take paid sick leave. As set forth above, the employment contracts submitted in support of each of the other Domestic Workers' visa applications provided that the Domestic Workers would receive paid sick leave, see supra ¶ 12(b), (d)-(e), (g)-(i).

   e. JAIDI instructed Domestic Worker-2, Domestic Worker-3, Domestic Worker-4, Domestic Worker-5, Domestic Worker-6, and Domestic Worker-7 to surrender their passports to the custody of CC-1's Manhattan Office.[15] As set forth above, the

---

[14] Based on my interviews of the Domestic Workers, my conversations with other law enforcement officers who interviewed the Domestic Workers, and my review of reports of those interviews, I have learned that MARIA LUISA ESTRELLA JAIDI, the defendant, and CC-1 permitted each Domestic Worker to take an annual, three-week paid vacation in the Philippines, with airfare included.

[15] Based on my interviews of the Domestic Workers, my conversations with other law enforcement officers who interviewed the Domestic Workers, and my review of reports of those interviews, I have learned that at times, some of the Domestic Workers did not comply with the instruction from MARIA LUISA ESTRELLA JAIDI, the defendant, to surrender their passports. In addition, I have learned that CC-2, CC-3, or other staff in CC-1's Manhattan Office would return a Domestic Worker's passport to enable the worker to

employment contracts submitted in support of visa applications for Domestic Worker-1, Domestic Worker-3, Domestic Worker-4, Domestic Worker-5, and Domestic Worker-7 provided that the Domestic Workers would remain in possession of their passport at all times, *see supra* ¶ 12(d)-(i).

WHEREFORE, deponent respectfully requests that MARIA LUISA ESTRELLA JAIDI, and RAMON SINGSON ESTRELLA, a/k/a "Ramon Miguel Estrella," a/k/a "Ting Estrella," the defendants, be arrested, and imprisoned or bailed, as the case may be.

_____

ANDREW SINANOGLOU
Special Agent
Diplomatic Security Service
United States Department of State

Sworn to before me this
__ day of March, 2019

_____

THE HONORABLE PAUL E. DAVISON
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

---

travel for his or her annual vacation, or if a Domestic Worker otherwise requested the return of his or her passport.