UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

THE KINGDOM OF MOROCCO,

                Movant,

-against-

THE UNITED STATES OF AMERICA,

                Respondent.

**SEALED**

No. 19-mc-00396 (NSR)

OPINION & ORDER

---

NELSON S. ROMÁN, United States District Judge

    On August 26, 2019, in connection with an ongoing grand jury investigation in the Southern District of New York, the Kingdom of Morocco ("Morocco") filed this miscellaneous civil action against the United States of America. (Notice of Motion, filed Aug. 26, 2019.) Morocco moves this Court for an order directing the United States and its agents in the United States Department of Justice, the United States Attorney's Office for the Southern District of New York, and the United States Department of State's Diplomatic Security Service (collectively, the "Government") to "respect Morocco's Consular Privileges" (the "Motion"). (*Id.*)

    In bringing this Motion, Morocco seeks to (1) enjoin the Government from "asking any questions of any person regarding his or her work for or at" Morocco's Consulate General in New York (the "Consulate"); (2) order the Government "to submit all interview notes, recordings, and transcripts of any testimony or interviews with" various individuals for an *in camera* review; (3) enjoin the Government from using any materials or questions and answers regarding privileged matters that it previously obtained without permission; (4) order the Government to, *inter alia*, "explain . . . what 'steps' it has taken to preserve Morocco's consular and other privileges"; (5) order the Government to "immediately cease its review of the totality of the seized materials"

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/11/2019

until the Court establishes procedures to protect "Morocco's sovereign rights and consular and other privileges"; and (6) order the Government to return privileged consular information obtained during its investigation or to destroy such privileged information after an *in camera* review by the Court. (Morocco's Proposed Order ("Proposed Order"), filed Aug. 26, 2019.)

For the following reasons, Morocco's Motion is DENIED.

## BACKGROUND

I. **Factual Background**

   A. **The Criminal Complaint**

On March 8, 2019, the Government filed a criminal complaint (the "Complaint") against Maria Luisa Estrella Jaidi ("Jaidi") and Ramon Singson Estrella ("Estrella"), alleging that Jaidi and Estrella conspired to commit visa fraud, make materially false statements, and induce aliens to illegally come to, enter, and reside in the United States. (Compl., *United States v. Jaidi*, 19-mj-02307-UA (S.D.N.Y.), ECF No. 2, at 1, 3.) According to the Complaint, between about 2006 to about 2016, Jaidi, Estrella, and an unnamed co-conspirator, hired several Filipino nationals to work as domestic workers and farmhands, but instructed them to apply for U.S. visas by falsely representing that they had been hired to work at the Consulate. (*Id.* ¶ 1, 4.)

   B. **The Government's Seizure of Property**

On March 16, 2019, Morocco authorized the Government to search the New York residence of a Moroccan diplomat (the "Residence") by waiving the Residence's inviolability. (Aff. of Abbe Lowell in Support of the Motion ("Lowell Aff."), filed Aug. 26, 2019, Ex. B.) In waiving inviolability, however, Morocco "reiterate[d] its insistence for the full respect of international law on diplomatic immunities and privileges" and warned that "[n]o action should be undertaken which would violate in anyway" these privileges and immunities. (*Id.* Ex. B; *see also*

*id.* Ex. D (requesting that "[n]o action should be undertaken which would violate in anyway these [Vienna] Conventions").) Morocco further expressed its desire that the Government would "enter the premises with legal counsel for [Morocco] so that they may together review, consider and inventory the belongings that remain." (*Id.* Ex. B.)

That same day, with inviolability of the Residence waived, the Government executed its search warrant to seize various items including, as relevant here, the personal cellular devices of certain inhabitants of the Residence. (Morocco Memo. of Law in Support of the Motion ("Morocco Mot."), filed Aug. 26, 2019, at 4.) According to Morocco, "at least some of those cell phones contain privileged consular information" under the Vienna Convention on Consular Relations ("VCCR"). (*Id.* at 5.) Therefore, on March 27, 2019, Morocco wrote to the Government to demand the "immediate return of" privileged information, as well as the destruction of that information in the Government's possession. (Lowell Aff. Ex. F, at 2.)

On March 28, 2019, the Government responded by acknowledging Morocco's privileges, but noted that "the VCCR does not render inviolable non-consular information in the possession of consular mission members—including non-consular information on consular employees' cellphones." (*Id.* Ex. H.) The Government nevertheless assured Morocco that "[t]o the extent [it] encounters any information that appears to pertain to the exercise of consular functions, [it] will immediately cease [its] review of that information and delete it from [its] files."[1] (*Id.*)

Morocco again raised its concerns in a June 24, 2019 letter to the Government. Specifically, Morocco reiterated its position that "a host country cannot take consular archives and documents simply upon a promise to delete such information from its files." (*Id.* Ex. I, at 2.) Morocco noted that its concerns were amplified by its understanding that "investigative agents

---

[1] The Government further asked Morocco to "advise" it of "any specific pieces of information in those cellphones pertaining to the exercise of consular functions." (*Id.*)

who executed the search warrant may have been specifically seeking documents" it believed were "clearly protected and privileged under international law."[2] (*Id.*) The Government responded on July 10, 2019 by reemphasizing that it "recognizes its obligations under Article 33 of the [VCCR] to ensure the inviolability of consular archives and documents." (*Id.* Ex. J.) With that understanding in mind, the Government explained that it was working with the United States Department of State ("State Department") to "review seized materials for any archival material" so that it could "tak[e] all appropriate steps to ensure consistency with the VCCR." (*Id.*)

### C. The Government's Purportedly Improper Questioning of Witnesses

On March 26, 2019, Morocco raised concerns to the State Department regarding the Government's "question[ing of], inten[tion] to question, and . . . serv[ice of] subpoenas on" Consulate members. (*Id.* Ex. G. at 1.) Given its concerns, Morocco requested that the Government make a "formal written request" to Morocco to "obtain authorization for testimony of a Consulate or Mission official[] concerning official acts." (*Id.* ¶ 2.) Morocco reaffirmed this position directly to the Government in its June 24 letter. (*Id.* Ex. I, at 2.)

Notwithstanding this request, Morocco maintains that, without ever seeking permission, the Government continued to violate Morocco's privileges and immunities under the VCCR on two particular occasions. *First*, Morocco contends that the Government interviewed at least ▮ "administrative staff members" about "their confidential work at the Consulate." (Morocco Mot. 6.) *Second*, ▮

---

[2]  Morocco further explained that it had concerns regarding the Government's assurance that it would delete any privileged information it encountered. (*Id.*) Specifically, it pointed out that "the scope of Morocco's consular privilege may not be immediately evident with respect to certain documents and other forms of information." (*Id.*) As such, Morocco insisted on "some level of coordination . . . to ensure that [Morocco's] privileges are not compromised." (*Id.*)

███████ ███ ████████████████████████████████████

████████████████████████████████████████████████

(*Id.*)

## II. Procedural Background

On July 31, 2019, Morocco wrote to the Government to raise three issues related to the Government's investigation. (*Id.* Ex. K.) Of relevance here, Morocco re-asserted its consular privileges and demanded the return of electronic devices seized during the March 14, 2019 search of the Residence. (*Id.* at 1, 3-4.) In reaffirming its concerns, Morocco requested that the Government answer the following four questions:

> First, who is allegedly doing a preliminary review of the materials [obtained during the March 14, 2019 search]? Second, who is making the determination as to what is, and is not, privileged under international law? Third, have materials in fact been deleted because they constitute materials covered under the VCCR as consular materials? Fourth, why has the Government refused to return consular information to Morocco or, at the very least, to engage in a constructive dialogue with Morocco about how best to treat this protected information in light of the United States being a signatory to the VCCR?

(*Id.* at 3.) The Government responded on August 13, 2019, disputing Morocco's characterization of its conduct throughout the course of the investigation. (*Id.* Ex. L.) Specifically, the Government (1) maintained that the materials obtained during the March 14, 2019 were lawfully seized pursuant to a search warrant that authorized it to retain custody of devices containing evidence of a crime, and (2) rejected Morocco's suggestion that the Government had "fail[ed] to abide by its obligations under Article 33 of the [VCCR]," as well as its "overbroad assertions of consular privileges." (*Id.* at 1-2.) Once again, the Government reiterated that it was "taking careful steps and working closely with the U.S. Department of State to identify any archival material and to ensure consistency with the VCCR." (*Id.* at 2.)

Soon after, on August 26, 2019, Morocco commenced this miscellaneous civil action by filing the Motion under seal. That same day, Morocco filed a proposed sealing order, which District Judge Vincent Briccetti, during a hearing, so ordered on a temporary basis in light of the Government's interest in preserving the secrecy of its ongoing grand jury investigation. (*See* Gov't Mem. in Opp. to the Motion ("Gov't Opp."), filed Sept. 16, 2019, Ex. A, at 4-5; *see also* Order to Seal, dated Aug. 26, 2019.) While granting the sealing order, the Judge Briccetti declined to address the merits of the motion,[3] and, in turn, set a briefing schedule for the parties on the Motion. (Gov't Opp. Ex. A at 2-3, 6.)

Thereafter, the Government filed its opposition to Morocco's Motion on September 16, 2019, Morocco replied on September 23, 2019, and, after seeking leave of the Court, the Government filed a sur-reply on September 30, 2019. This Opinion and Order followed.[4]

## **DISCUSSION**

Morocco requests that the Court "order the U.S. Government to abide by the VCCR and [Vienna Convention on Diplomatic Relations ("VCDR")]" by (1) "temporarily enjoining the U.S. Government's review of all seized materials"; (2) ordering the Government to (a) explain what steps it has taken to ensure compliance with the VCCR and VCDR, (b) articulate the standards it is applying to its review of seized material, (c) detail how it is treating material that Morocco has identified as privileged, and (d) identify any privileged information it has seized and what it has done with those documents; and (3) ordering a process that would allow Morocco to assert privileges on material before they are seized. (Morocco Mot. 9-10.)

---

[3] During the hearing, Judge Briccetti also remarked that the Motion is "not a [type of] motion [he had] seen before." (Gov't Opp. Ex. A at 7.) He nevertheless expressed concern about the Motion, characterizing it as "mumbo jumbo [] to shut down the government's grand jury investigation." (*Id.* at 2.)

[4] Upon filing the Motion, Morocco requested oral argument before the Court. The Court denies this request. Oral argument is discretionary, and the Court has determined that the parties have sufficiently and substantially briefed the relevant issues such that the Court can decide the instant motion based on the parties' written submissions.

6

The Government, however, strongly opposes this Motion. In support of its position, the Government advances three primary arguments. *First*, the Government argues that neither the VCCR nor the VCDR create an "affirmative cause of action" that would allow Morocco to raise its claims in federal court. (Gov't Opp. 6-16.) *Second*, the Government contends that, notwithstanding the unavailability of judicial recourse, Morocco's requested relief would force this Court to improperly intervene in an ongoing grand jury investigation, and, in any event, Morocco does not have standing to intervene or obtain the remedies it seeks. (*Id.* at 16-20; Gov't Sur-Reply in Opp. to the Motion ("Gov't Sur-Reply"), filed Sept. 30, 2019, at 6-7.) *Finally*, as set forth in its *ex parte* submission for *in camera* review,[5] the Government maintains that its investigation has not violated the Vienna Conventions.

As will be explained, the Court has not determined that Morocco has established beyond conjecture that the Government is actually infringing on any consular privileges. Accordingly, the Court will DENY Morocco's Motion. The Court addresses the parties' contentions below.

## I. Overview of Applicable Provisions of the Vienna Convention

The VCCR[6] was drafted in 1963, and later ratified by the United States, upon the advice and consent of the Senate, in 1969. *See* Vienna Convention on Consular Relations, Apr. 24, 1963, 21 U.S.T. 77, T.I.A.S. No. 6820 (entered into force Dec. 24, 1969). The main intent of the VCCR was to promote "consular relations, privileges and immunities" that would allow for the

---

[5]  *Ex parte* submissions are acceptable if they are necessary to maintain grand jury secrecy. *See In re John Doe, Inc.*, 13 F.3d 633, 636 (2d Cir. 1994) ("where an *in camera* submission is the only way to resolve an issue without compromising a legitimate need to preserve the secrecy of the grand jury, it is an appropriate procedure."). Because there is an ongoing grand jury investigation and disclosure of the materials provided by the Government might jeopardize the investigation, the Court accepts the Governments *ex parte* submission and reviews it *in camera* to ultimately resolve the narrow issues implicated by this Motion.

[6]  Given that the parties briefing focuses on the VCCR, rather than the VCDR, the Court's opinion addresses only that specific treaty. To the extent the VCDR is applicable—for example the inviolability provision of Article 24, *see* Vienna Convention on Diplomatic Relations, art. 24, Apr. 18, 1691 23 U.S.T. 3227, T.I.A.S. No. 7502 (entered into force Dec. 13, 1972) ("The archives and documents of the mission shall be inviolable at any time and wherever they may be."), the Court's opinion is intended to apply with equal force.

"development of friendly relations among nations, irrespective of their differing constitutional and social systems." *Id.* pmbl.  The drafters made it clear, however, that the "purpose of such privileges and immunities is not to benefit individuals but to ensure the efficient performance of functions by consular posts on behalf of their respective States." *Id.*

In total, the VCCR is comprised of 79 Articles, each regulating various aspects of consular activities.  As relevant here, several of the Articles delineate the applicability of consular privileges and immunities to consular posts, consular officers, and other members of a consulate.  *Id.*

Certain articles relate to immunities surrounding consular premises and documents.  For example, Article 33 concerns the inviolability of consular archives and documents.  Specifically, it provides that "consular archives and documents shall be inviolable at all times and wherever they may be."  *Id.* art. 33.  The definition of "consular archives" is comprehensive and broad, covering "all the papers, documents, books, films, tapes and registers of the consular post," among other things.  *Id.* art. 1(1)(k); *see also In re Terrorist Attacks on Sept. 11, 2001*, 03-MDL-01570 (GBD)(SN), 2019 WL 3296959, at *2 (S.D.N.Y. July 22, 2019) ("[G]iven the plain language of the Conventions—and given the broad interpretation of 'inviolability' adopted by the Court of Appeals—the Court concludes that the inviolability protections articulated in . . . Articles 33 and 35 of the VCCR, are 'higher interests' that can justify a narrowly-tailored sealing . . . .").  Notably, the VCCR contains no provisions about whether this inviolability can be waived.

Other provisions of the VCCR delineate the privileges and immunities accorded to consulate members and employees.  For example, Article 44 specifies the extent to which consular members can be compelled to provide testimony or evidence related to the exercise of consular functions.  VCCR, art. 44.  In relevant part, Article 44 explains that "[m]embers of a consular post may be called upon to attend as witnesses in the course of judicial or administrative proceedings"

8

and "shall not decline to give evidence." *Id.* art. 44(1).  However, the Article makes clear that consular members are "under no obligation to give evidence concerning matters connected with the exercise of their functions or to produce official correspondence and documents relating thereto." *Id.* art. 44(3).  Additionally, under Article 45, "[t]he sending State may waive, with regard to a member of the consular post, any of the privileges and immunities provided for in Articles 41, 43, and 44." *Id.* art. 45(1).  The waiver must be "express" and "shall be communicated to the receiving State in writing." *Id.* art. 45(2).  In essence, Articles 44 and 45 serve as a procedural protection against compulsory processes of the courts.

## II. Morocco's Ability to Bring This Instant Motion

The Supreme Court, in the *Head Money Cases*, 112 U.S. 580 (1884), aptly summarized the relationship between treaties and private, enforceable rights.  As the Court explained, a "treaty is primarily a compact between independent nations," and the "enforcement of its provisions" depends on the parties to it.  *Id.* at 598.  When there is a violation, the injured party typically would need to seek redress through "international negotiations and reclamations," rather than the judiciary.  *Id.*  Nevertheless, the Court acknowledged that treaties may sometimes contain provisions that are "capable of enforcement [] between private parties in courts of the country."  *Id.*  Such provisions, the Court clarified, are considered the "law of the land," and are on equal footing with statutes, "whenever its provisions prescribe a rule by which the rights of the private citizen or subject may be determined." *Id.* at 598-99.

To this end, whether a treaty provides a right or remedy is matter of interpretation of the agreement.  Restatement (Third) of Foreign Relations § 907 cmt. a; *see also United States v. Emuegbunam*, 268 F.3d 3778, 390 (6th Cir. 2001) ("Whether or not treaty violations can provide the basis for particular claims or defenses thus appears to depend upon the particular treaty and

9

claim involved."). Still, "the background presumption is that '[i]nternational agreements, even those directly benefiting private persons, generally do not create private rights or provide for a private cause of action in domestic court." *Medellin v. Texas*, 552 U.S. 491, 506 n.3 (2008) (alteration in original). Courts will look to whether there is a "clear statement of the intent of the treaty drafters" when determining whether the treaty provides for judicial recourse. *See Mora v. New York*, 524 F.3d 183, 201 (2d Cir. 2008).

Relying on these principles, the Government maintains that Morocco does not have a "judicially enforceable cause of action in U.S. courts" (Gov't Opp. 6), and frames Morocco's Motion, which largely seeks judicial intervention to enforce certain immunities delineated by the VCCR, as an "affirmative[]" action for "post-facto declaratory and injunctive relief against the United States" (Gov't Sur-Reply 3). According to the Government, there is no basis to entertain the Motion because neither the text of either the VCCR or VCDR, nor either's ratification history, provides clear indication that the drafters intended to create a private right of action to Morocco related its privileges and immunities. (Gov't Opp. 6-7.) To buttress this position, the Government points to case law declining to recognize a private right of action under VCCR Article 36[7] and references the State Department's apparent support of its position. (*Id.* at 6-8, 10, 13.)

At the outset, the Court notes that this is a miscellaneous civil action instituted for the sole purpose of filing a motion. As novel as a "Motion for an Order Directing the U.S. Government to Respect Morocco's Consular Privileges" may be, it raises issues that are essentially in the spirit of

---

[7] Article 36 provides nationals of the sending State with access to consular officials. For example, under Article 36(1)(a), "consular officers shall be free to communicate with nationals of the sending State and to have access to them," while "Nationals of the sending state shall have the same freedom with respect to communication with and access to consular officers." VCCR, art. 36(1)(a). Likewise, under Article 36(1)(b), a national of the sending State is entitled to "competent authorities of the receiving State [], without delay, inform[ing] the consular post of the sending State if . . . [the] national . . . is arrested or committed to prison or to custody pending trial or is detained in any other manner." *Id.* art. 36(1)(b). And under Article 36(1)(c), "consular officers shall have the right to visit a national of the sending State who is in prison, custody or detention." *Id.* 36(1)(c).

defensive motions such as motions to quash or motions for a protective order. Put differently, Morocco's Motion is an attempt to obtain protection—premised on the privileges and immunities conferred by the VCCR and VCDR—against the Government's past exercise of compulsory processes during its investigation. Courts in this and other circuits have repeatedly recognized the availability of such protective remedies, regardless of the ultimate disposition of the issue. *See, e.g.*, *Aurelius Capital Master, Ltd. v. Republic of Argentina*, 589 F. App'x 16, 17 (2d Cir. 2014) (explaining that "[i]nsofar as the discovery demands reach diplomatic or consular property that is immune from attachment, Argentina should object if and when appellees actually seek to execute on such property, but that "'self-serving legal assertion' of immunity does not entitle it to withhold otherwise discoverable information"); *United States v. Wilburn*, 497 F.2d 946, 947-48 (5th Cir. 1974) (concluding that, absent evidence that a consulate member to whom a subpoena was directed would refuse to testify, district court could not issue preliminary injunction against the issuance of a subpoena); *In re Terrorist Attacks on Sept. 11, 2001*, 2019 WL 3296959 at *2-4 (granting Saudi Arabia's motion to seal certain documents pursuant to inviolability provisions under VCCR and VCDR); *City of New York v. Republic of Philippines*, No. 03Civ.6085RCCFSM, 2004 WL 2710026, at *4-5 (S.D.N.Y. Nov. 23, 2004) (compelling mission's communications with State Department concerning non-Mission issues, in part because plaintiff was not seeking documents that were otherwise protected by Articles 24 and 27 of the VCDR); *Box v. Dallas Mexican Consulate Gen.*, No. 3:08-cv-1010-O, 2013 WL 12353107, at *2 (N.D. Tex. Mar. 4, 2013) (noting that the "consul has the privilege to decline to answer questions related to his public duties and cannot be compelled to testify on matters pertaining to their official functions"). Morocco thus has ample support in bringing this motion through a miscellaneous civil action.

The Government's reliance on circuit cases such as *Mora v. New York*, 524 F.3d at 183, does not alter this conclusion. The *Mora* decision was premised on the nature of protections provided by Article 36 of the VCCR, which specifically pertains to "consular officers' access to their nationals detained by authorities in a foreign country." 524 F.3d at 189 (quoting *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 338 (2006)). The Second Circuit did observe that Article 36 provided for access to individual foreign nationals. *Id.* at 194-95. But it nevertheless explained that "several textual and contextual considerations" established that Article 36's obligations were premised on the exercise of consular functions, "rather than an individual's ability to benefit from these functions." *Id.* at 195. When coupled with VCCR Preamble's mandate that "the purpose of such privileges and immunities is not to benefit individuals but to ensure the efficient performance of functions by consular posts on behalf of their respective States," the Second Circuit ultimately concluded that the drafters of the VCCR never intended to confer an individual right under Article 36. *Id.* at 196-97 ("By referring only to 'consular relations, privileges and immunities,' the Preamble suggests that any relations, privileges, or immunities the Convention creates are strictly those of consular officials."). Conversely, here, Morocco is a foreign sovereign seeking to enforce its documentary and testimonial immunities under the VCCR. Whether or not Morocco is ultimately successful, the protections it seeks certainly go toward "ensur[ing] the efficient performance of the functions by consular posts on behalf of their respective States." VCCR, prmbl.

The Government's reliance on *Breard v. Greene*, 523 U.S. 371 (1998) is equally unavailing. Although the Court in *Breard* did observe, albeit in dicta, that "neither the text nor the history of the Vienna Convention clearly provides a foreign nation a private right of action in United States' courts to set aside a criminal conviction and sentence for violation of consular notification provisions," *id.* at 377, the context of that statement was necessarily narrow and

12

distinguishable. Specifically, the Republic of Paraguay, relying on Article 36 of the VCCR, had sought relief for an individual Paraguayan national who was convicted of rape and murder in the United States and was awaiting imminent capital punishment. *See Republic of Paraguay v. Allen*, 949 F. Supp. 1269, 1271-72 (E.D. Va. 1996), *aff'd*, 134 F.3d 622 (4th Cir. 1998), *cert. denied*, *Breard*, 523 U.S. at 371. These unique facts at issue—a foreign sovereign seeking to set aside a conviction and sentence of one of its nationals, which was premised on purported rights that the VCCR may confer on that national (rather than the sovereign)—clearly are not present here. Rather, Morocco brings its Motion on its own behalf and, as already explained, the VCCR provisions upon which Morocco (as an actual signatory to the treaty) relies directly confer the privileges and immunities it now seeks to protect.

In sum, the Court concludes that Morocco, as a foreign sovereign seeking protections of its rights under the VCCR and VCDR, may properly file the present Motion before this Court.

### III. Morocco is Not Entitled to the Remedies It Seeks at this Juncture

Morocco maintains that it is entitled to intervene in an active grand jury investigation to assert its privileges under VCCR and VCDR and further obtain court-ordered procedures to ensure maintenance of its privileges. (*See* Morocco Reply in Support of the Motion ("Morocco Reply"), filed Sept. 23, 2019, at 8-9.) The Government, however, contends that (1) Morocco seeks a "sweeping order," without providing a "compelling reason" or "clear basis in law and fact," to force the Government to curtail various aspects of its investigation (Gov't Opp. 18-19); and (2) Morocco does not have standing to seek the remedies it wants because the Government "does not seek to compel" any privileged material (Gov't Sur-Reply 7).

Neither party has provided, nor has this Court identified, authorities related to the types of remedies for which Morocco now seeks, particularly in the VCCR or VCDR context. The Court

thus reviews cases dealing with other similar defensive discovery motions (particularly, motions to quash) and privilege laws to extrapolate broader principles for resolving the pending Motion

To prevail on defensive discovery motions, such as motions to quash, the movant must establish its standing to do so. *See KGK Jewelry LLC v. ESDNetwork*, No. 11 Civ. 9236 (LTS) (RLE), 2014 WL 1199326, at *3 (S.D.N.Y. Mar. 21, 2014). To this end, a nonparty to a proceeding generally may not challenge compulsory processes—particularly those directed at other nonparties—unless it is asserting its own privilege. *See Langford v. Chrysler Motors Corp.*, 513 F.2d 1121, 1126 (2d Cir. 1975). If a nonparty does claim a privilege, it "bears the burden of establishing its applicability to the case at hand." *In re Grand Jury Subpoenas Dated Mar. 19, 2002 and Aug. 2, 2002*, 318 F.3d 379, 384 (2d Cir. 2003) ("[P]rivileges are recognized 'only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth.'"). "The proponent of the privilege may not 'assert blanket or categorical claims of privilege'"; instead, it "must show 'that the privilege applies to each communication for which it is asserted.'" *Samad Bros., Inc. v. Bokara Rug Co. Inc.*, No. 09 Civ. 5843 (JFK)(KNF), 2010 WL 5094344, at *2 (S.D.N.Y. Nov. 30, 2010) (quoting *In re Veiga*, 746 F. Supp. 2d 27, 33-34 (D.D.C. 2010)).

Morocco, who is neither a party to the grand jury proceedings nor a target of any subpoenas issued pursuant to the grand jury's investigation, maintains that it is entitled to its requested remedies by virtue of the potential privileges and immunities that may have been infringed by the Government's investigation. To that end, Morocco alleges that the Government ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮ (2) "questioned ▮▮▮

consular administrative staff members . . . about their work at the Consulate" (*id.* 6, 12), and (3) has not "offered to articulate the standard by which it is allegedly determining whether a seized document is privileged," which may be contained in the cellular devices obtained pursuant to a search warrant[8] (*id.* 7, 13).  As a result of the general secrecy accorded to grand jury proceedings, *see* Fed. R. Crim. Proc. 6(e)(2), Morocco's concerns are necessarily guided by its belief (supported by third-hand accounts) that potential privilege violations may be afoot rather than actual, first-hand knowledge.  However, after a careful review of the parties' submissions, including the Government's *in camera* submission, the Court ultimately concludes that Morocco has failed to establish, beyond conjecture, that the Government is infringing on privileges and immunities conferred by the VCCR.  Morocco is not entitled to the numerous remedies it seeks, at least at this time.

### A. Witness Testimony and Interviews

Morocco's first major contention is that, during interviews, government officials have engaged in a line of improper inquiry regarding witnesses' "confidential work" at the Consulate.  However, beyond this vague description, Morocco does not concretely identify what consular functions, if any, into which the Government has prodded.[9]  As an initial matter, to the extent that

---

[8]   Morocco has not, at this point, contested the lawfulness of that search warrant.
[9]   Article 5 of the VCCR provides an extensive list of consular functions: (1) "protecting in the receiving State the interests of the sending State and of its nationals, both individuals and bodies corporate, within the limits permitted by international law"; (2) "furthering the development of commercial, economic, cultural and scientific relations between the sending State and the receiving State and otherwise promoting friendly relations between them in accordance with the provisions of the present Convention"; (3) "ascertaining by all lawful means conditions and developments in the commercial, economic, cultural and scientific life of the receiving State, reporting thereon to the Government of the sending State and giving information to persons interested"; (4) "issuing passports and travel documents to nationals of the sending State, and visas or appropriate documents to persons wishing to travel to the sending State"; (5) "helping and assisting nationals, both individuals and bodies corporate, of the sending State"; (6) "acting as notary and civil registrar and in capacities of a similar kind, and performing certain functions of an administrative nature, provided that there is nothing contrary thereto in the laws and regulations of the receiving State"; (7) "safeguarding the interests of nationals, both individuals and bodies corporate, of the sending State in cases of succession mortis causa in the territory of the receiving State"; (8) "safeguarding, within the limits imposed by the laws and regulations of the receiving State, the interests of minors and other persons lacking full capacity who are nationals of the

the Government inquired into high-level, general questions about a witness's position at the Consulate, such questions do not strike this Court as an inquiry about the "exercise of [] functions" that is protected by Article 44. Indeed, it cannot be the case that mere general descriptions about a consulate member's or employee's position is contrary to Article 44; such questions provide virtually no details about Consulate's actual governance or the substance of its work. Likewise, although the Second Circuit has cautioned against a narrow reading of consular functions under VCCR's catchall provision, Article 5(m), *see Heaney v. Gov't of Spain*, 445 F.2d 501, 505 (2d Cir. 1971), conduct related to the visa fraud scheme is plainly "prohibited by the laws and regulations" of the United States, such that there can be no "consular function" that is implicated.[10] *See id.* art 5(m); *see also Ill. Commerce Comm'n v. Salamie*, 369 N.E.2d 235, 241 (Ill. App. Ct. 1977) ("[W]e do believe that this Article means that a consul cannot embark upon a prolonged course of conduct flagrantly in violation of the criminal laws of this country and defend it as being within the scope of his consular functions"). ▮

▮

▮ Overall, the Court simply sees no basis from

---

sending State, particularly where any guardianship or trusteeship is required with respect to such persons"; (9) "representing or arranging appropriate representation for nationals of the sending State before the tribunals and other authorities of the receiving State"; (10) "transmitting judicial and extra-judicial documents or executing letters rogatory or commissions to take evidence for the courts of the sending State in accordance with international agreements in force or, in the absence of such international agreements"; (11) "exercising rights of supervision and inspection provided for in the laws and regulations of the sending State in respect of vessels having the nationality of the sending State"; (12) "extending assistance to vessels and aircraft . . . and to their crews, taking statements regarding the voyage of a vessel, examining and stamping the ship's papers, and, without prejudice to the powers of the authorities of the receiving State, conducting investigations into any incidents which occurred during the voyage, and settling disputes of any kind between the master, the officers and the seamen in so far as this may be authorized by the laws and regulations of the sending State"; and (13) "performing any other functions entrusted to a consular post by the sending State which are not prohibited by the laws and regulations of the receiving State or to which no objection is taken by the receiving State or which are referred to in the international agreements in force between the sending State and the receiving State." VCCR, art. 5.

[10] Nor would it be improper for the Government to ask questions related to Jaidi and Estrella hiring domestic workers or the responsibilities of those workers. *See Rana v. Islam*, 305 F.R.D. 53, 60 (S.D.N.Y. 2015) ("Hiring a domestic worker . . . in a consular official's household falls neither within any of the specific functions set forth in the VCCR nor within the scope of Article 5(m)'s catchall provision")

Morocco's submission to compel the Government to surrender all notes, recordings, and transcripts for further review, or to otherwise entertain Morocco's other requested remedies.



(Morocco Mot. 6.) As Morocco offers no other details related to Government conduct that violates VCCR Article 44, the Court again finds no basis to entertain the extraordinary remedies sought by Morocco.[11]

### B. Cellphone Material

At the outset, both parties contest whether or not Article 33 creates a cognizable evidentiary privilege under FRE 501. (*Compare* Morocco Reply 3-4 *with* Gov't Sur-Reply 1-2.) Although the State Department has apparently taken the view that no evidentiary privilege exists, there are authorities that appear to support a contrary view. *See, e.g.*, *Aurelius Capital Master*, 589 F. App'x at 17 (noting that "[i]nsofar as the discovery demands reach diplomatic or consular *documents* that may be privileged or 'inviolable' under the treaties, Argentina should present its objections to the

---

[11] Given the Government's representation that it will not inquire into consular functions (Gov't Sur-Reply 5), portions of Morocco's Motion are effectively moot. Nevertheless, the Court cautions the Government to proceed carefully in future inquiries. Although the Government maintains that, notwithstanding Article 45, voluntary disclosures related to consular functions are not prohibited under the VCCR, it is unclear from text of the VCCR or related law that this privilege and immunity is one which the *consular member, rather than the sending state*, may waive through a voluntary disclosure. *See, e.g.*, *People v. Corona*, 259 Cal. Rptr. 524, 539 (Cal. Ct. App. 1989) ("Indeed, to permit an individual consular officer to waive the privilege independent of the state would impair the state's ability to follow a consistent long-term policy with regard to assertion of the privilege."). The Court need not resolve this issue now, but the Government should bear in mind that, to the extent a privilege does exists, Morocco should, out of an abundance of caution, be treated as the final arbiter of waiver.

district court in the form of assertions of privilege or inviolability")[12]; *Ewald v. Royal Norwegian Embassy*, No. 11-CV-2116 SRN/SER, 2013 WL 6094600, at *3-5 (D. Minn. Nov. 20, 2013) (affirming magistrate judge's denial of plaintiff's motion to compel because discovery requests "exceed[ed] the scope of the Embassy's waiver of inviolability under international law," including VCCR Article 33). The Court need not, at this juncture, decide this issue. Even assuming there is a recognized evidentiary privilege under Article 33, Morocco has not established that the Government failed to protect these privileges during the ongoing grand jury investigation.

The gist of Morocco's position is that it is unaware of whether the Government has encountered consular archives and documents contained in *personal* cellular devices, and, if it has, what steps has taken to sequester or delete that protected material. Ultimately, Morocco's factual showing related to the Government's compliance (or non-compliance) with Article 33 is too tenuous to warrant intervention. Without pointing to concrete evidence or referencing specific documents that Government will overlook or disregard, Morocco's privilege concerns related to a broad, unspecified category of "inviolable" materials simply do not confer standing on Morocco to intervene in ongoing grand jury proceedings and, in turn, assert Article 33 protections.

Even if Morocco could intervene, the Government's treatment of those immunities does not warrant the various remedies compelling the Court's intervention into the ongoing grand jury proceedings. Upon a review of the Government's *in camera* submission, the Court is satisfied, at this time, that the Government has taken seriously its obligation to protect archival material inadvertently encountered during the course of its review of the personal cellular devices and has done so in conjunction with the State Department's Office of the Legal Advisor. Indeed, with the

---

[12] To be sure, the Second Circuit was careful to note that it ultimately took "no view on Argentina's treaty interpretations." *Id.* Nevertheless, the court provided sufficient guidance for how courts should view the protections created by VCCR Article 33.

guidance of the State Department, the Government has taken all steps during its review process to sequester and delete protected material, while preserving relevant, non-privileged material. This process is plainly proper and within the spirit of respecting the important protections conferred by Article 33. *Cf. United States v. Rayburn House Office Bldg. Room 2113, Wash., D.C. 20515*, 497 F.3d 654, 664 (D.C. Cir. 2007) (ordering, pursuant to Fed. R. of Crim. Proc. 41(g), the return of material obtained through a valid search warrant that was privileged under the Speech or Debate Clause of the Constitution but declining to order the return of non-privileged material). Accordingly, the Court sees no reason, based on the record before it, to order the remedies sought by Morocco.[13]

In sum, it is clear that the VCCR confers critical protections to ensure the proper functioning of consular relations and governance. But, in its moving papers, Morocco has not provided a sufficient factual basis regarding the Government's alleged violations of the VCCR to support the drastic remedies it now seeks. Therefore, Morocco's motion for an order directing the Government to "respect Morocco's consular privileges" is DENIED. Should new, concrete information come to light, however, Morocco is granted leave to renew this Motion at a later date.

---

[13] The Court notes that, to the extent Morocco requests that the Court to order an *in camera* review of materials (Proposed Order ¶ 6) or to deploy an "independent review" (Morocco Reply 9), such a review would inevitably result in even *further* dissemination of allegedly protected material. Nevertheless, Morocco points to no extraordinary circumstances or considerations—beyond the fact that consular archives and documents are inviolable—that would militate in favor of precluding Government attorneys from conducting a preliminary review of material. *Compare United States v. Grant*, No. 04 CR 207BSJ, 2004 WL 1171258, at *3 (S.D.N.Y. May 25, 2004) ("Permitting the Government's privilege team to conduct an initial review of the documents will narrow the disputes to be adjudicated and eliminate the time required to review the rulings of the special master or magistrate judge, thus reducing the possibility of delay in the criminal proceedings.") *with United States v. Stewart*, No. 02 CR. 396 JGK, 2002 WL 1300059, at *10 (S.D.N.Y. June 11, 2002) ("[T]his case presents a number of extraordinary circumstances [including Sixth Amendment concerns] that favor the appointment of a Special Master to perform an initial review of the materials for privilege and responsiveness."). Nor has Morocco established any reason to doubt that Government attorneys will "conduct themselves with integrity" in engaging in a review. *See Grant*, 2004 WL 1171258 at *3.

### IV. The Government's Motion to Unseal

The Government requests to unseal the docket and the entirety of its motion. (Gov't Opp. 20.) Morocco, for its part, does not object to the unsealing of the docket. (Morocco Reply 10.) The Court, as such, GRANTS the Government's request to unseal the docket.

Morocco nevertheless seeks an opportunity to "explain why certain documents should remain under seal or be publicly filed with redactions." (*Id.*) Given what appears to be a minor disconnect between the parties related to the scope of what should and should not be unsealed, the Court declines to, at this time, issue an order entirely unsealing all materials on the docket at this time. Instead, the parties are directed to confer and provide, by November 18, 2019, a joint stipulation and order regarding what filings, if any, should remain under seal and/or be redacted, including whether any information in this Opinion and Order should be redacted. If the parties are unable to come to resolution, the parties are directed to submit a letter to the Court that indicates that the parties were unable to reach an agreement by November 18, 2019.

### CONCLUSION

For the foregoing reasons, the Kingdom of Morocco's motion is DENIED.

The parties are directed to submit a proposed joint order regarding the unsealing and redaction of materials on the docket by November 18, 2019. However, if there is no resolution, the parties are directed to submit letter indicating that the parties were unable to reach an agreement by November 18, 2019.

Dated: October 18, 2019
White Plains, New York

SO ORDERED:

_____
NELSON S. ROMÁN
United States District Judge